IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ERIC ZWILLING,                          )         CASE NO. 5:14CV2494
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )         MAGISTRATE JUDGE
                                        )         KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                  )
SECURITY ADMINISTRATION,                )
                                        )         **MEMORANDUM OPINION & ORDER**
                    Defendant.          )


Plaintiff Eric Zwilling ("Zwilling") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 12.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.


## I. Procedural History

Zwilling protectively filed an application for DIB on June 23, 2013, alleging a disability

onset date of April 14, 2007.  Tr. 11, 149.  He alleged disability based on the following:

traumatic brain injury; post-traumatic stress disorder ("PTSD"); back injury; and a fractured

pelvis.  Tr. 190.  After denials by the state agency initially (Tr. 85) and on reconsideration (Tr.

102), Zwilling requested an administrative hearing.  Tr. 123.  Prior to the hearing, Zwilling

amended his alleged onset date to November 17, 2012.  Tr. 164.  A hearing was held before

Administrative Law Judge ("ALJ") Jeffrey Raeber on May 28, 2014.  Tr. 30-68.  In his July 1,

2014, decision (Tr. 11-24), the ALJ determined that there were jobs that existed in significant

numbers in the national economy that Zwilling could perform, i.e., he was not disabled.  Tr. 23.

Zwilling requested review of the ALJ's decision by the Appeals Council (Tr. 6) and, on

September 11, 2014, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Zwilling was born in 1977 and was 35 years old on the date his application was filed.  Tr.

149.  He received a GED in 2003.  Tr. 191.  He previously worked as a welder and was an

infantry soldier in the military.  Tr. 191.

### B.  Relevant Medical Evidence

Zwilling was wounded in combat in Iraq in 2004, sustaining multiple fractures and a head

injury resulting in a three month coma.  Tr. 416.  During a second tour of duty, he sustained "a

blast injury."  Tr. 416.  In October 2008, the Department of Veterans Affairs issued a letter

informing Zwilling that it had determined he had a 50% disability status based on PTSD,

bilateral tinnitus, lumbar herniated disc disease, and "migraine headaches, residuals of a

traumatic brain injury."  Tr. 506.

On October 1, 2011, Zwilling had an MRI taken of his lumbar spine.  Tr. 413-414.   The

MRI revealed a central and left paracentral disc herniation at L5-S1 causing mild central canal

compromise and mild to moderate bilateral neural foramen compromise from disc osteophytes.

Tr. 414.

On December 12, 2011, an x-ray was taken of Zwilling's lumbar spine that revealed

degenerative changes.  Tr. 411-412.

On December 14, 2012, Zwilling underwent back surgery after he was involved in a car accident.  Tr. 286.  He had suffered a burst fracture of his lumbar spine at L3; the surgeon fused his lumbar spine at L2, L3, and L4.  Tr. 286-287.

On January 10, 2013, Zwilling was admitted to the emergency room upon suffering an infection at his surgical site.  Tr. 259.  On January 11, 2013, a surgeon drained his incision site and irrigated his infected lumbar area.  Tr. 284-285.  An x-ray of Zwilling's lumbosacral spine taken on January 17, 2013, showed surgical hardware at L2-L4 and a fracture at L3.  Tr. 410.  An MRI of his lumbar spine showed a fracture at L3 with a fusion at L2, L3, and L4.  Tr. 406.  It also revealed degenerative changes, grossly unchanged, and post-operative changes with three fluid collections or abscesses.  Tr. 406.  MRI testing of his thoracic spine revealed small disc protrusions at T3-4 and T4-5, with no effect on his cord, and subcutaneous soft tissue edema in his posterior midline at the T11-T12 level with a small fluid collection or abscess in the subcutaneous tissue.  Tr. 407-408.  On January 19, 2013, Zwilling underwent a lumbar wound wash out and debridement from infection of the surgical site.  Tr. 236, 239.  He was discharged to the Veteran Administration (VA) hospital for antibiotic treatment and further wound care.  Tr. 236, 316-318.

On March 14, 2013, a CT scan of Zwilling's lumbar spine showed degenerative disc disease with a markedly degenerated disc at L5-S1 with posterior ridging and degenerated disc with moderate size posterior disc protrusion with annular calcification at L4-L5.  Tr. 275.  A lumbar spine MRI revealed postsurgical changes, including surgical hardware; a burst fracture at L3; non-specific changes; possible osteomyelitis; non-specific edema and enhancement within the posterior paraspinal musculature throughout the lumbar region; and fluid collection within the subcutaneous soft tissues extending from L1 through L4 levels.  Tr. 263.  X-ray testing

revealed underlying degenerative disc disease with a markedly degenerated disc at the L5-S1 level with posterior ridging and a degenerative disc with moderate size posterior disc protrusion with annular calcification at the L4-5 level.  Tr. 265.

On March 15, 2013, Zwilling underwent exploratory surgery, including the removal of his lumbar spine hardware, due to his recurring surgical wound infection.  Tr. 282-283.  On March 20, 2013, he was admitted to the VA for antibiotic treatment for an infection in his wound.  Tr. 312.  He was discharged with IV antibiotics.  Tr. 312.

On April 18, 2013, Zwilling's surgeon noted that he was "doing quite well now" and that the wound healed "nicely"; there was no evidence of infection.  Tr. 278.

On June 12, 2013, Zwilling presented to the VA with complaints of tingling and numbness on the right side of his face, tensing/seizure activity, and difficulty speaking.  Tr. 309.  MRI testing of Zwilling's brain was normal; EEG testing revealed mild slowing without any epileptiform discharges.  Tr. 309.  Drug testing revealed positive test results for methamphetamines, benzoids, opiates, THC and tricyclic antidepressants.  Tr. 309.  Zwilling admitted using methamphetamines, oxycodone, and Percocet.  Tr. 335.  It was noted that his seizure episode was likely provoked by methamphetamine use.  Tr. 309.  Zwilling underwent detoxification and was instructed to follow-up with the Veterans Addiction Recovery Center ("VARC") for further treatment.  Tr. 336.  He did not follow the recommendation.  Tr. 336.  He was discharged on June 17, 2013, with a diagnosis of narcotic withdrawal and substance abuse.  Tr. 308.

On July 5, 2013, Zwilling saw Rosemaree Fisher, a physician assistant with the VA, for a follow-up visit.  Tr. 330-332.  Fisher wrote, "[Zwilling] is angry that his pain meds have been taken away."  Tr. 330.  Zwilling admitted "to smoking pot."  Tr. 330.  He asked to be "drug

screen[ed] today and give him his pain meds back." Tr. 330.  Fisher commented that she would only order him "gabapentin/NSAID/Tylenol as recommended by pain management."  Tr. 330. She recommended he go to VARC, which he refused.  Tr. 330.  Zwilling asked to see a pain management specialist and for approval to see a non-VA doctor for additional surgery.  Tr. 331. Fisher opined that he should not undergo more surgery at this time and instructed Zwilling to follow-up in six months.  Tr. 331.

On August 9, 2013, Zwilling saw non-VA, pain management specialist Kevin Balter, M.D., for back pain management.  Tr. 447-449.  Zwilling reported wearing a back brace at all times.  Tr. 447.  He rated his pain as an 8/10.  Tr. 447.  Upon examination, Zwilling was in no acute distress, could rise easily from a seated position, and could move around the room without difficulty.  Tr. 447.  He had very tender lower lumbar paravertebral areas over his facet joints, tenderness in his sacroiliac joints, decreased sensation in his left lower extremity, and a normal gait.  Tr. 447-448.  He had negative straight leg raising and normal coordination and reflexes. Tr. 448.  Dr. Balter diagnosed him with sacrum disorder, lumbar osteoarthritis, back pain, a compression fracture of the vertebrae, and an unspecified lumbar disc disorder.  Tr. 448.  He prescribed OxyContin for pain, sacroiliac joint injections, and recommended Zwilling continue using his back brace.  Tr. 448.

On September 6, 2013, Zwilling told Dr. Balter that his pain medication was effective but that it caused nausea and occasional vomiting.  Tr. 444.  On October 4, 2013, Zwilling saw Dr. Balter to reschedule the injections he missed because of insurance problems.  Tr. 441.  Dr. Balter prescribed a TENS unit.  Tr. 442.  On November 5, 2013, Zwilling stated that he was unable to get the TENS unit due to its cost but that he would get it "in a month or so."  Tr. 439.  Dr. Balter

told him not to wear his back brace all the time "but only when he is physically active to avoid weakening his back." Tr. 439.

On December 3, 2013, Dr. Balter noted that the urine screen taken in November showed possible adulteration of Zwilling's urine sample. Tr. 435. He refilled Zwilling's pain medication prescription and noted that Zwilling needed to schedule his joint injections and behavioral assessment to confirm the appropriateness of opioid therapy. Tr. 436. On January 3, 2014, Zwilling told Dr. Balter that his pain medication side effects were lessened by use of an anti-nausea drug and taking the medication with food. Tr. 450. On February 4, 2014, Zwilling reported that his medications were effective in controlling his pain. Tr. 470. Dr. Balter noted that a second drug screen, performed that month, was negative for oxycodone and that Zwilling was transferring his pain management care to a VA facility. Tr. 471.

On March 1, 2014, an MRI of Zwilling's lumbar spine revealed mild canal stenosis at L4-5 due to retrolisthesis, a disc protrusion, facet hypertrophy, and foraminal narrowing, left greater than right; disc bulging at L2-3, L3-4, and L5-S1, with mild foraminal narrowing; a compression fracture with an irregular appearance at L3; and post-surgical granulation tissue. Tr. 493-495.

On March 13, 2014, Zwilling returned to the VA.  Tr. 496-498. He stated that he was "happy on the gabapentin, and that he does not use drugs any longer." Tr. 497. He requested a referral to pain management for headaches, to a mental health provider for his depression/PTSD, and to a gastroenterologist for his hepatitis C.  Tr. 497.

## C.  Medical Opinion Evidence–Consultative Examiners

**Physical:** On October 22, 2013, Zwilling saw Brittany Carter, D.O., for a physical consultative examination. Tr. 416-423. Zwilling reported that, in 2004, he sustained a combat

injury in Iraq; was in a coma for three months; and that he was sent back to Iraq for an additional 12 months.  Tr. 416.  He said he could not walk more than a few hundred feet and had short-term memory impairment.  Tr. 416.  He reported low back pain as constant and worsened with sitting and prolonged standing.  Tr. 416.  His pain is "tolerable" with medication.  Tr. 416.  Zwilling stated that he could not sit for longer than 15 minutes, stand for more than 5 minutes, walk more than 100 feet, or lift more than 20 pounds.  Tr. 417.

Upon examination, Zwilling could get on and off the examination table without assistance.  Tr. 417.  He was unable to bend over to touch his toes and displayed diffuse tenderness to palpation around his spine, particularly around his surgical scars.  Tr. 417.  He could heel-to-toe walk, had full strength in his extremities, and intact fine motor skills, memory, and cognition.  Tr. 417.  He had a reduced range of motion in his lumbar spine.  Tr. 422.  Dr. Carter diagnosed a history of a traumatic brain injury and chronic low back pain secondary to a blast injury and motor vehicle accident.  Tr. 418.  She stated, "I would agree with this claimant that he would not be able to sit any longer than 15 minutes, stand any longer than 5 minutes, walk any further than 100 feet or lift anything more than 20# due to his extensive scar formation and history of multiple back surgeries."  Tr. 418.

**Mental:** On October 31, 2013, Zwilling saw William Mohler, M.A., for a psychological consultative examination.  Tr. 425-430.  Zwilling reported that he had depression since leaving the military.  Tr. 426.  He said he was taking an anti-depressant and experienced crying spells twice a week.  Tr. 426.  Upon examination, Mohler commented that Zwilling "appeared to be somewhat anxious and mildly depressed" and reported having panic attacks twice a week.  Tr. 427.  He opined, "The overall symptom package suggests a posttraumatic stress disorder with anxiety being a more significant symptom than depression.  However, he is receiving no specific

treatment for the anxiety." Tr. 427.  His concentration "appeared to be problematic.  He definitely has a short attention span" and he was mildly impaired in his ability to abstract and generalize.  Tr. 427.

Zwilliing's testing results using the Wechsler Adult Intelligence Scale-IV placed him in the normal range.  Tr. 428.  Mohler opined, "there does not appear to be evidence there has been cognitive decline as a result of the traumatic head injury."  Tr. 428.  Under the Wechsler Memory Scale, Zwilling scored in the low average range, except for delayed memory, which was in the borderline range and, Mohler opined, "appears to be somewhat impacted by his head injury."  Tr. 428-429.  Mohler diagnosed Zwilling with chronic PTSD, back pain, and brain injury.  Tr. 429.   He opined that Zwilling would improve with better treatment of the anxiety component of his PTSD but that his memory deficits were unlikely to significantly improve.  Tr. 429.

Mohler opined that Zwilling's ability to understand, remember, and carry out instructions would "generally be equal" to other people with average intelligence, except that he would have mild difficulties with delayed memory.  Tr. 430.  He opined that Zwilling appeared to have some substantial problems with his attention span that may cause problems in maintaining persistence and pace for simple tasks, and would cause additional problems with multi-step tasks.   Tr. 430.  He would have no deficiencies in social abilities.  Tr. 430.  His anxiety issues would likely cause him some difficulty in a work environment and work stress would likely increase his panic attacks; "All of this would be helped by better treatment of the anxiety component of his [PTSD]."  Tr. 430.

### D.  Testimonial Evidence

#### 1.  Zwilling's Testimony

Zwilling was represented by counsel and testified at the administrative hearing.  Tr. 31-56.  He lives with his girlfriend and her two children, aged 12 and 13.  Tr. 37.  He has two daughters from a previous marriage that he sees a few times a month.  Tr. 37.

Zwilling testified that he last worked in 2008 as a truck driver for a moving company for a few months.  Tr. 34.  Prior to that, he was an infantry soldier in the army for four years.  Tr. 35. He was a welder for six years before entering the military.  Tr. 36.  He does not have a driver's license; the last time he drove a car was when he was involved in a car accident in 2012.  Tr. 38. His doctor recommended that he not drive because he had a seizure while driving, although his car accident was not the result of a seizure.  Tr. 35.  His first seizure was in 2010 and his last seizure was in 2012.  Tr. 39.  He has not had a seizure since 2012 and he takes no medication for seizures.  Tr. 39.

Zwilling stated that, during the day, he wakes up and "sit[s] around the house."  Tr. 40. He has a hard time going out in public due to his PTSD.  Tr. 40.  He watches television and "do[es] a lot of things with my girlfriend's kids once they come home from school—help them with their homework."  Tr. 40.  He can vacuum or stand and do the dishes for about ten minutes, after which time he has to sit down or else his back starts hurting badly.  Tr. 40.  Sitting down for too long also aggravates his back.  Tr. 40.

Zwilling obtained a GED before joining the military.  Tr. 41.  Since his brain injury his reading is slower and, because of short-term memory loss, he sometimes has to stop and re-read a paragraph because he will forget what he read.  Tr. 41.  He sometimes forgets to shave and brush his teeth and he will leave things in the microwave.  Tr. 54.  His girlfriend helps him go up and down the stairs, which he must do to leave his house.  Tr. 54.  He is able to go up and down stairs but needs "at least a shoulder to hold on to."  Tr. 55.

Zwilling stated that his most significant problem is his PTSD "combined with my brain injury" because it isolates him. Tr. 42. He has crying spells every day, nightmares, difficulty sleeping, and it is impossible for him to get thoughts of combat out of his head. Tr. 42, 50. He is receiving counseling at the VA every month. Tr. 42. He has been told that it will not improve, "it's something that stays with you the rest of your life." Tr. 50-51. He takes OxyContin for back pain and medication for his PTSD. Tr. 48. He also takes a combination of three different medications for his traumatic brain injury. Tr. 48. He takes his medications as prescribed, although they make him tired, especially directly after taking them. Tr. 48. The medications for his mental impairment do not provide him with "100 percent relief." Tr. 49.

His back pain is "constant ridiculous pain" and, without medication, he would not be able to get out of bed. Tr. 43. He stated that the doctors told him that his four surgeries since 2012 have caused a lot of damage to his back. Tr. 44-45. The pain is constant and throbbing and stabs every time he twists or flexes his back in any way. Tr. 44. He wears a back brace "all the time." Tr. 51. Upon wakening and prior to going to bed, Zwiling lies down and uses a machine he got from the VA—a brace that pumps hot water around his back. Tr. 44. It relaxes his back well for about an hour. Tr. 44. He also has a TENS machine but it does not provide relief. Tr. 52. His medication gives him about 20% relief and his doctors say that that is as good as it will get. Tr. 45. He had radio frequency ablation performed on his back, wherein the doctor burned the nerve endings, and he had injections after his fourth surgery, but these procedures did not provide relief. Tr. 53.

Zwilling stated that he is unable to bend over "past 20 or 30 degrees at all" and sometimes his girlfriend has to help him tie his shoes. Tr. 45. On a good day his pain is 6/10, and on a bad day he is in tears and cannot get out of bed. Tr. 45. He has a bad day at least once

a week.  Tr. 45.  His pain has not improved since his accident.  Tr. 45.  He is unable to walk very far and the more he walks the worse it gets.  Tr. 46.  He could barely walk the two blocks to the hearing and had to lean on his mother for support.  Tr. 46.  He cannot lift any weight.  Tr. 46.  His neurosurgeon recommended that he not lift more than 15 or 20 pounds.  Tr. 46.  He is able to lift small things and has no problems reaching.  Tr. 46.  He can sit for 20-30 minutes before it starts "really aggravat[ing]" him.  Tr. 47.

### 2.  Vocational Expert's Testimony

Vocational Expert Charles McBee ("VE") testified at the hearing.  Tr. 56-63.  The ALJ discussed with the VE Zwilling's past relevant work.  Tr. 57.  The ALJ asked the VE to determine whether a hypothetical individual of Zwilling's age, education, and work experience could perform Zwilling's past relevant work if the individual had the following characteristics: could perform work at the light level; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, kneel, crouch, crawl, and reach overhead bilaterally; could have occasional exposure to vibration but could never use moving machinery, be exposed to unprotected heights, or do commercial driving; could perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only routine work-place changes; and could have occasional superficial interaction with the public and with coworkers, i.e., no negotiation or confrontation with others.  Tr. 58.  The VE answered that such an individual would not be able to perform Zwilling's past work.  Tr. 58.  The ALJ asked if such an individual could perform any work in the national economy and the VE answered that such an individual could perform work as a photocopy machine operator (2,000 Ohio jobs; 135,000 national jobs), inspector and hand packager (1,000 Ohio jobs; 30,000 national jobs), and folder of laundry products (2,000 Ohio jobs; 90,000 national jobs).  Tr. 58-59.

Next, the ALJ asked the VE if the same hypothetical individual could perform those jobs if the individual could work in an area with moderate noise, like a restaurant or a call center.  Tr. 59.  The VE replied that such an individual could still perform work as a photocopy machine operator but could not perform the other two jobs.  Tr. 59.  The VE added two more jobs that such an individual could perform: palletizer (1,500 Ohio jobs; 90,000 national jobs) and garment bagger (2,000 Ohio jobs; 90,000-100,000 national jobs).  Tr. 59.

The ALJ asked the VE if the second hypothetical individual could perform the previously identified jobs if the individual could stand and walk for about two hours and sit for up to six hours in an eight-hour work day.  Tr. 59.  The VE stated that such an individual could not perform the previously identified jobs because the individual described would be working at the sedentary level.  Tr. 60.  The VE then identified three other jobs that such a hypothetical individual described by the ALJ could perform: surveillance monitor (3,000 Ohio jobs; 125,000 national jobs), hand mounter (300 Ohio jobs; 30,000 national jobs), and document preparer (14,000 Ohio jobs; 350,000 national jobs).  Tr. 60.

The ALJ then asked the VE to consider whether any of the jobs he previously identified would be affected if the hypothetical individual could have no over-the-shoulder supervision.  Tr. 60-61.  The VE answered that all the jobs he previously identified did not require over-the-shoulder supervision and that the individual would work independently.  Tr. 61.  The ALJ next asked to what extent a person could be off-task and be able to perform the previously identified jobs.  Tr. 61.  The VE replied that an individual is required to be on-task 80% of the workday, including generally prescribed breaks, and that any percentage greater than 20% off task would result in severe reprimand or dismissal.  Tr. 61.

Next, Zwilling's attorney asked the VE to consider whether the first hypothetical individual described by the ALJ could perform any work if that individual had the following additional characteristics: could have no contact with the public or coworkers and no more than 15% contact with a supervisor.  Tr. 62.  The VE answered that such an individual could perform the same jobs at the same numbers that he previously listed in response to the ALJ's first hypothetical.  Tr. 62.  Next, Zwilling's attorney asked whether a hypothetical individual of Zwilling's age, education, and work history could perform work if the individual would be absent more than two days per month on a regular basis.  Tr. 63.  The VE stated that such an individual could perform no work.  Tr. 63.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*


### IV. The ALJ's Decision

In his July 1, 2014, decision, the ALJ made the following findings:

1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.  Tr. 13.

2.     The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 17, 2012 through his date last insured of December 31, 2013.  Tr. 13.

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.   Through the date last insured, the claimant had the following severe impairments: sacrum disorder, osteoarthritis, compression fracture of the vertebrae, anxiety disorder, organic brain syndrome and posttraumatic stress disorder (PTSD).  Tr. 13.

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 14.

5.   Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: he can never climb ladders, ropes, or scaffolds.  The claimant can occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  He can have occasional exposure to vibration.  He must avoid the use of moving machinery, commercial driving, and unprotected heights.  The claimant can perform simple, routine, and repetitive tasks in an environment free of fast-paced production requirements and routine work place changes.  He can occasionally interact with the public and co-workers, but such contact must be superficial, defined as no negotiation, or confrontations or direction of others.  Tr. 16.

6.   Through the date last insured, the claimant was unable to perform any past relevant work.  Tr. 23.

7.   The claimant was born on November 1, 1977 and was 36 years old, which is defined as a younger individual age 18-49, on the date last insured.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 23.

8.   The claimant has at least a high school education and is able to communicate in English.  Tr. 23.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 23.

10.   Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the economy that the claimant could have performed.  Tr. 23.

11.   The claimant was not been under a disability, as defined in the Social Security Act, at any time from November 17, 2012, the alleged onset date, through December 31, 2013, the date last insured.  Tr. 24.

## V. Parties' Arguments

Zwilling objects to the ALJ's decision on two grounds.  He argues that the ALJ's assessment of his residual functional capacity ("RFC") was erroneous because the ALJ failed to properly weigh the medical opinion evidence and improperly assessed Zwilling's pain.  Doc. 13, pp. 10-19.  In response, the Commissioner submits that the ALJ did not err in his RFC assessment and his assessment is supported by substantial evidence.  Doc. 14, pp. 8-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err in assessing Zwilling's RFC

#### 1.  Dr. Carter is not a treating physician, thus her opinion is not entitled to controlling weight.

Zwilling argues that the ALJ erred because he failed to give the opinion of Dr. Carter, whom Zwilling characterizes as his treating physician, controlling or great weight.  Doc. 14, p. 9.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source

controlling weight if he finds the opinion well supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §

404.1527(c)(2).  However, Dr. Carter was not Zwilling's treating physician.  Zwilling saw Dr.

Carter one time at the behest of the Social Security Administration for a consultative

examination.  Tr.  416.  Thus, her opinion is not entitled to controlling weight.  The record

contained no opinion submitted by a treating source, as the ALJ observed.  Tr. 21.

### 2. The ALJ properly evaluated the opinions of Dr. Carter and Mr. Mohler

An ALJ evaluates a non-treating source opinion by considering the supportability and

consistency of the opinion, the specialization of the medical source, and any other factors raised

by the claimant or others.  20 C.F.R. § 404.1527(c).  With respect to Dr. Carter's opinion, the

ALJ explained,

> In terms of the claimant's function [Dr. Carter] stated "I would agree with this claimant
> that he would not be able to sit any longer than 15 minutes, stand any longer than 5
> minutes or lift anything more than 20# due to his extensive scar formation and history of
> multiple back surgeries."  Dr. Carter's assessment appears to rely heavily on the
> claimant's subjective complaint and reported history.  It is inconsistent and unsupported
> by the findings of her physical examination.  She did not have the benefit of reviewing
> the claimant's medical records prior to forming her impressions.  While her assessment of
> the claimant's capacity for lifting and carrying is arguably supported by the claimant's
> diminished range of motion of the lumbar spine, Dr. Carter identified no objective
> findings which would support her conclusions as to the claimant's inability to sit for
> longer than fifteen minutes or stand longer than five.  She specifically noted that the
> claimant demonstrated normal motor strength of the lower extremities and remained able
> to get on and off the examination table and heel-toe walk.  These findings suggest greater
> capacities for sitting, standing and walking than identified by Dr. Carter.  Accordingly, I
> gave Dr. Carter's opinion less than full weight.

Tr. 21-22.

Zwilling argues that the ALJ's "limited reasoning is in error as Dr. Carter not only finds

limited range of motion and the inability for Plaintiff to touch his toes, but also points out that

17

Plaintiff has extensive and obvious scarring of the back." Doc. 13, p. 12. The ALJ acknowledged in an earlier passage that Dr. Carter observed that Zwilling had a mildly limited range of motion in his lumbar spine, that he was unable to touch his toes, and that he had tenderness to palpation and multiple scars. Tr. 21. The ALJ also commented, "Dr. Carter observed no neurological deficits of the claimant's lower extremities, indicating that the claimant maintained normal motor strength. She indicated that the claimant 'can perform a gait and heel-toe walk.'" Tr. 21. Zwilling does not explain how "extensive and obvious scarring" on his back, a slightly limited range of motion of his lumbar spine, and the inability to touch his toes is indicative of greater impairments than those provided for in the ALJ's RFC assessment. Moreover, the ALJ noted that the record reflected that Zwilling received conservative treatment since recovering from his surgeries and infections, did not pursue consistent treatment or follow up with his orthopedic surgeon, and did well on oral medications. Tr. 18-19. He also found that Zwilling's statements concerning the limiting effects of his symptoms were not entirely credible. Tr. 17. Accordingly, the ALJ considered the supportability and consistency of Dr. Carter's opinion per 20 C.F.R. § 404.1527(c).

Zwilling asserts, "The ALJ's mental [RFC] assessment is also in error given the ALJ's failure to address Mr. Mohler's finding that Plaintiff would have 'some' problems responding appropriately to workplace pressures." Doc. 13, p. 14. This is false. The ALJ considered Mohler's opinion of Zwilling's ability to adapt to workplace stressors; noted that it was not "stated in terms of the claimant's maximum capacity"; and observed that Mohler "did not suggest limitation of the claimant's capacity for low-stress tasks and indicated that the claimant's stress tolerance would improve with treatment of the anxiety component of his PTSD." Tr. 22.

In short, the ALJ's consideration of the opinion evidence comported with 20 C.F.R. § 404.1527(c) and was not erroneous. Nor was it error for the ALJ to pose a hypothetical to the VE based on this RFC assessment, as Zwilling asserts. Doc. 13, p. 15.

### B. The ALJ did not err when assessing Zwilling's subjective reports of pain

Zwilling argues that the ALJ's determination that he is not disabled by pain is not supported by substantial evidence. Doc. 13, p. 17. He asserts that "objective evidence proves the existence of underlying conditions causing severe symptomatology." Doc. 13, p. 18. In support of his assertion, Zwilling cites to results of an MRI taken in March 2014, "consistent complaints of pain in his low back and lower extremities"; objective findings on physical examination revealing SI joint tenderness; a history of four back surgeries; use of a back brace and TENS machine; and testimony and medical records showing that he "continues to experience severe, worsening pain." Doc. 13, pp. 17-19.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)). Here, the ALJ considered Zwilling's subjective reports of pain and the severity of his impairments, but found that the reported limiting effects of his symptoms were not entirely credible. Tr. 17. The ALJ stated, "Zwilling's treatment history and the absence of strongly positive, regularly noted findings indicative of severe musculoskeletal impairment on physical examinations by his treatment providers do no[t] support greater or additional limitations than those set forth in the [RFC]." Tr. 17. The ALJ explained that Zwilling's surgeon reported that he was "doing quite well" in April 2013 at a follow-up visit after his last surgery to remove the hardware in his back. Tr. 17. The surgeon recommended a

follow-up visit in six weeks but Zwilling did not comply and did not seek any treatment from an orthopedist thereafter but instead presented to a pain management specialist, Dr. Balter.  Tr. 17-18.  The ALJ noted that Dr. Balter observed a normal gait, motor strength, coordination, reflexes, and negative straight leg raise testing.  Tr. 18.  Dr. Balter's clinical findings were identical in Zwilling's five subsequent visits; he reported that OxyContin effectively managed his pain; and he did not pursue Dr. Balter's recommendations for further treatment.  Tr. 18.  In March 2014, Zwilling went back to the VA and reported that he was happy on his current medications.  Tr. 18.  Accordingly, the ALJ found that this conservative treatment, i.e. primarily oral pain medication, and inconsistent drug screens suggest that Zwilling's reliance upon these medications declined.  Tr. 19.

With respect to Zwilling's alleged mental impairments, the ALJ noted, "there is no evidence of the claimant's treatment for symptoms associated with PTSD or traumatic brain injury" and "no references to the claimant's ongoing counseling in the extensive VA medical records."  Tr. 19.  The ALJ observed that, again, Zwilling did not follow through with recommendations for substance abuse treatment.  Tr. 19.  After further discussion, the ALJ concluded, "Given the claimant's failure to pursue specialized mental health treatment throughout much of the period for adjudication and the absence of more strongly positive and regularly noted clinical findings associated with his PTSD and history of traumatic brain injury, additional or greater functional limitations are not supported by the evidence as a whole."  Tr. 20.

In sum, there is no dispute that Zwilling had physical and mental impairments; "the mere existence of those impairments, however, does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."  *Despins v.*

*Comm'r of Soc. Sec.*, 257 Fed. App'x 923, 930 (6th Cir. 2007).  The ALJ's analysis was consistent with the regulations.  *See* 20 C.F.R. § 404.1529(c) (an ALJ considers objective evidence, opinion evidence, and other evidence, including daily activities, the type, dosage, and effectiveness of medication, and other treatment received).  In sum, the ALJ considered Zwilling's complaints of pain and substantial evidence supports his conclusion regarding these complaints.  Accordingly, his decision must be affirmed.  *See Jones*, 336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: November 2, 2015

Kathleen B. Burke
United States Magistrate Judge